IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RICKY B . TIBBS, | * | |
| Plaintiff | * | |
| v | * | Civil Action No. PX-19-613 |
| EMMANUEL NWOSU, R.N., | * | |
| YETUNDE P. ROTIMI, N.P. | | |
| DOCTOR YANAS SISAY, | * | |
| DOCTOR ATNAFU, | | |
| | * | |
| Defendants | | |

\*\*\*

## MEMORANDUM OPINION

Pending in this civil rights action is Defendants' Emmanuel Nwosu, R.N., Yetunde Rotimi, N.P., Yonas Sisay, M.D., and Gedion Atnafu, M.D. (collectively, the Medical Defendants") Motion to Dismiss or, in the Alternative, a Motion for Summary Judgment.  ECF No. 32.  Plaintiff Ricky Tibbs has responded and the matter is ripe for resolution without need for a hearing.  ECF Nos. 33, 34.  *See* Local Rule 105.6 (D. Md. 2016).  For the reasons that follow, the motion is GRANTED.

## I. Background

### A. Procedural History

Tibbs filed suit on February 26, 2019, against several supervisory and medical staff employed at the Maryland Correctional Institution-Jessup ("MCIJ"), alleging he received constitutionally inadequate and negligent medical care on February 20, 2018 and March 24, 2018 while housed as an inmate.  Tibbs separately challenged the prison administrative remedy process.  ECF No. 1 at 5-9.  All parties, save for the Defendants that are the subject of this decision, were previously dismissed from this action.  ECF Nos. 6, 22.  The Court also permitted Tibbs to amend

his Complaint to clarify which medical providers allegedly denied him medical care.  ECF Nos.

12, 20.  On February 7, 2020, the Medical Defendants filed their dispositive motion to which Tibbs

has responded.

### B.      Factual Background

Tibbs is 59 years old, clinically obese, and suffers from such chronic ailments as deep vein

thrombosis and hypothyroidism.  ECF No. 32-5 at 1-2 ¶¶ 3-4.  On February 20, 2018, Tibbs began

to feel dizzy.  Moments later, he was unable to speak or move the right side of his body and had

to be transported to the medical unit in a wheelchair.  Tibbs quickly regained his speech but still

had difficulty moving his right side.  ECF No. 1 at 5.

While Tibbs was explaining what had happened to him, Defendant Rotimi instructed that

Tibbs be put "in the cage out in front of the medical unit and see if [the] condition happens again."

*Id.*  While Tibbs sat in the hallway in a wheelchair, Dr. Sisay walked by him without performing

any evaluation.  ECF No. 1 at 6.

The medical records reflect that Tibbs was examined initially by Angela Onyebadi, R.N.

and then referred to Rotimi.  ECF No. 32-4 at 4-6.  Tibbs described his symptoms to Rotimi, who

noted that Tibbs had sufficient strength on both sides, no arm weakness or facial drooping, and

clear speech.  Rotimi concluded that Tibbs exhibited no neurologic deficits or visible evidence of

a stroke.  But Tibbs wanted to go to the hospital.  Instead, he was kept in the medical unit for

observation and labs were drawn.  ECF No. 32-5 at 2-3 ¶6; ECF No. 32-4 at 4-6.  Although medical

records note that Tibbs left the area against medical advice, Tibbs disputes that account. *Id.*;  ECF

No. 34 at 2-3, 7.

On March 24, 2018, Tibbs again suffered a dizzy spell after climbing a flight of stairs.

Tibbs maintains that he fell and cut his head, but that Defendants did not implement concussion

protocols or take him to the hospital.  ECF No. 1 at 8, 21-22; ECF No. 1-1 at 7-11; ECF No. 34 at.

6, 8-10.  Records corroborate that Nurse Nwosu found Tibbs seated on the gym floor bleeding

from three cuts on his head. ECF No. 32-4 at 15. Otherwise. Nwosu did not observe any injury.

Nwosu cleaned Plaintiff's cuts and covered them with a pressure dressing.  Upon further

examination, Tibbs had a fever of 100.9 and his blood pressure was elevated. Nwosu contacted

Dr. Atnafu to request that Tibbs be transported to an emergency room.  However, shortly

thereafter, Tibbs' temperature and blood pressure declined.  Consequently, Dr. Atnafu directed

Nwosu to keep Tibbs in the medical unit for observation and to contact the medical director if

Tibbs' symptoms worsened.  ECF No. 32-4 at 15.  Tibbs' vitals were rechecked about an hour

later and he was given Tylenol. Tibbs thereafter refused to stay in medical further observation. *Id*.;

ECF No. 32-4 at 15.  Tibbs' temperature further declined to 99.1 and his blood pressure was within

normal limits.  He returned to his housing unit.  ECF No. 32-5 at 4-5 ¶ 9.

The next day, Tibbs saw nurse Michael Smith. Tibbs told Smith that he had lost

consciousness and fallen twelve hours earlier and had felt dizzy ever since.  ECF No. 32-4 at 17.

Tibbs still had a low fever but his blood pressure was again normal.  *Id.*  Tibbs was given Motrin

600 mg and blood work was ordered.  ECF No. 32-5 at 4 ¶ 10; ECF No. 32-4 at 18.

On March 26, 2018, Dr. Sisay examined Tibbs, noting that the "superficial laceration to

his scalp that was healing without sutures."  ECF No. 32-5 ¶11.  Sisay observed a small swelling

on the right temporal area of Tibbs' skull.  Tibbs' EKG was normal.  Sisay ordered x-rays of

Plaintiff's skull, right rib, and right tibia/fibula, ordered him bottom bunk cell placement, and

requested a neurology consultation.  *Id*.; *see also* ECF No. 32-4 at 18-20.

After Dr.Sisay received the radiology results, he informed Tibbs that the results were

normal.  Nor did Tibbs' examination reveal any neurological deficit.  ECF No. 32-5 at 4-5 ¶¶ 11-

13; ECF No. 32-4 at 23.

On April 2, 2018, Dr. Sisay saw Tibbs again in the chronic care clinic. Although Tibbs maintains that was still dizzy and had headaches during this visit, the contemporaneous medical records reflect that Tibbs reported no dizziness.  ECF No. 32-5 at 5-6 ¶ 14; ECF No. 32-4 at 25, 27; ECF No. 1 at 10.  Sisay documented that the requested neurological consultation had been declined in favor of prescribing Meclizine.[5]  ECF No. 32-4; ECF No. 32-5 at 5-6 ¶ 14.  Sisay did not request a neurological consult again because Tibbs was not dizzy, and his physical condition was "within normal limits except for the headache."  ECF No. 32-5 at 5-6 ¶ 14; ECF No. 32-4 at 25.

Tibbs continued to experience headaches and lightheadedness. He inquired about the status of the neurology consultation.  ECF No. 32-5 at 6 ¶¶ 15, 16; ECF No. 1 at 11-12: ECF No. 32-4 at 34.  On May 23, 2018, Tibbs was examined via telemedicine by Dr. Bajaj, a neurologist at Bon Secours Hospital.  Dr. Bajaj recommended that Tibbs' receive a an MRI of his brain, a carotid ultrasound, and a lipid profile, and he be prescribed aspirin once daily.  ECF No. 32-4 at 41, 42. ECF No. 32-5 at 6 ¶ 18; ECF No. 1 at 15.

On June 5, 2018, Tibbs was transferred out of the facility.  ECF No. 32-5 ¶ 19.  He received the carotid Doppler ultrasound ten days later.  ECF No. 32-4 at 44-47; ECF 32-5 at 7 ¶ 20.  He next underwent the MRI in July, which showed no evidence of any abnormality.  ECF No. 32-5 at ¶ 21; ECF 32-4 at 57.

At the follow-up telemedicine conference with Dr. Bajaj in August, Tibbs reported that he was still having dizzy spells and headaches. Bajaj prescribed Meloxican (Mobic) in response.

---

[5] Meclizine is used to prevent dizziness and nausea. See https://medlineplus.gov/druginfo/meds  (accessed June 17, 2020).

According to Tibbs, Bajaj told him that "he did not understand why this had taken so long."  ECF No. 1 at 21.  At another telemed visit with Dr. Bajaj in October 2018, Bajaj diagnosed Plaintiff with a "probable concussion and post-concussion syndrome with vertigo and a headache."  ECF No. 32-5 at 7 ¶ 22.

Tibbs maintains he still suffers from dizzy spells.  He challenges in this action "the lack of procedure and protocol performed during two medical incidents that happen[ed] to me."[7]  Tibbs seeks damages of $200,000 for pain and suffering.  ECF No. 1 at 23.

## II.  Standard of Review

Defendants move for dismissal of the claims or alternatively for summary judgment in their favor.  Tibbs does not object to treating this motion as one for summary judgment and does not argue that further discovery is warranted to decide the motion.  *Cf.* Fed. R. Civ. P. 56(d).  Defendants' pleading and submission of record evidence places Tibbs on notice that the Court may reach the propriety of summary judgment. *Id.* at 56(f).  The Court treats the motion accordingl7.

A motion for summary judgment brought pursuant to Rule 56 shall be granted if the movant demonstrates that no genuine issue of disputed material fact exists, rendering the movant entitled to judgment as a matter of law.  *See In re Family Dollar FLSA Litig.,* 637 F.3d 508, 512 (4th Cir. 2011).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "The party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514,

---

[7]   Tibbs notes that he has experienced similar delays in receiving treatment for foot and ankle problems, but that he is not raising those issues as grounds for relief.  ECF No. 1 at 11, 14, 15; ECF No. 34 at 8.

525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  Summary judgment

must be granted "against a party who fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof

at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court must view the evidence

in the light most favorable to the non-movant without weighing the evidence or assessing witness

credibility.  *See Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).

Factually unsupported claims and defenses may not proceed to trial. *Bouchat*, 346 F.3d at 526.

## III.  Discussion

### 1.       Eighth Amendment Claims

Tibbs' claims squarely raise whether the has been denied adequate medical treatment in

violation of the Eighth Amendment to the United States Constitution.  The Eighth Amendment

prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and

unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state an Eighth Amendment

claim for denial of medical care, a plaintiff must demonstrate that defendant's acts or omissions

amounted to deliberate indifference as to plaintiff's serious medical needs.  *See Estelle v. Gamble*,

429 U.S. 97, 106 (1976).

Deliberate indifference to a serious medical need requires proof that, objectively, the

prisoner was suffering from a serious medical need and that, subjectively, the prison staff, aware

of prisoner's need for medical attention, failed to either provide such care or ensure the needed

care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Scinto v.*

*Stansberry,* 841 F.3d 219, 225 (4th Cir. 2016).  The subjective component is satisfied only where

a prison official "subjectively knows of and disregards an excessive risk to inmate health or

safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *see also Rich v. Bruce*, 129 F.3d

336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.,* 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer,* 511 U.S. at 844).

"Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999). *See also Jackson*, 775 F.3d at 178 ("[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."). "[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson,* 195 F.3d at 695-96; *see also Jackson*, 775 F.3d at 178 (describing the applicable standard as an "exacting"). Further, the inmate's right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *United States v. Clawson,* 650 F.3d 530, 538 (4th Cir. 2011) (citing *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)).

If the plaintiff demonstrates a defendant's deliberate indifference, an official may still avoid liability if the defendant "reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)).

With this standard in mind, the Court addresses each defendant separately.

### A.    Dr. Sisay

Tibbs faults Dr. Sisay for failing to ask Tibbs about his medical condition on February 20, 2018, as Tibbs waited a wheelchair to be seen by medical staff, and Sisay's conveying to Tibbs that the initial request for neurological had not been approved.  ECF No.1 at 6, 10.  The record evidence, viewed most favorably to Tibbs, does not demonstrate that Sisay had been deliberately indifferent to Tibbs' serious medical need.  Even if Sisay had been momentarily inattentive, Tibbs was already under the care of medical providers. Tibbs cannot otherwise demand treatment by a specific doctor or in any specific manner.  *Shannon v. Dep't of Public Safety,* Civ. Action No. ELH-11-1830, 2012 WL 1150802 *6 (D. Md. April 5, 2012).  As to Sisay's communication that Tibbs' neurological consult had been denied at first, no evidence demonstrates that Sisay acted with reckless disregard for Tibbs' serious medical needs.  Indeed, Dr. Sisay re-requested the consult which ultimately Tibbs' received shortly after.  Nothing about Sisay's medical care supports an Eighth Amendment violation.  Summary judgment must be granted in Dr. Sisay's favor.

### B.  Rotimi

Tibbs singularly alleges that on February 20, 2018, Rotimi ordered that Plaintiff be "put in the cage" in front of the medical office to see if his reported partial paralysis and loss of speech recurred.  ECF No. 1 at 5.  Although Tibbs may not have agreed with where he had to stay during medical observation, Rotimi's instructions were consistent with the orders received to keep Tibbs under medical supervision.  Nothing in the record supports a claim of constitutional dimension. Summary judgment is likewise granted in Rotimi's favor.

### C.  Dr. Atnafu

Tibbs faults Dr. Atnafu for refusing to order Tibbs' transport to an emergency room on

February 20 or March 24, 2018.  The record, viewed most favorably to Tibbs, showed that Atnafu made these calls after receiving evidence that Tibbs was stable, not in any acute distress, and ultimately not in need of emergent medical care beyond that which the prison medical unit could provide.  During the March episode, Atnafu made clear that medical personnel should seek further guidance if Tibbs' condition worsened.  Although Tibbs maintains that Atnafu failed to follow standard concussion protocol, even if true, such failure does not amount to a reckless disregard of Tibbs' serious medical needs.  Failure to follow standard protocol of this sort, if even medically applicable, supports at best a finding of negligence, not deliberate indifference.  Summary judgment is granted in favor of Atnafu.

### D.  Nwosu

Tibbs appears to contend that March 24, 2018, Nwosu did not properly examine, treat or assess him.  Tibbs, however, acknowledges that Nwosu cleaned and wrapped the lacerations on his head and made several calls to inquire whether Tibbs should be transported to an emergency room and attempted to locate the physician's assistant who stitched lacerations. The record, viewed most favorably to Tibbs, simply does not include any evidence that Nwosu exhibited deliberate indifference to Tibbs' medical needs.  Summary judgment is granted in Nwosu's favor.

### 2.  Negligence Claims

Tibbs also brings medical negligence claims.  The Court declines to exercise supplemental jurisdiction over them.  *See* 28 U.S.C. § 1367(c) (stating that a district court "may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction.").  "When, as here, the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction."  *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)

(citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-727 (1966)).  These claims

are dismissed without prejudice so that Tibbs may pursue them in state court, if possible.[9]

## IV.  Conclusion

The Medical Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary

Judgment (ECF No. 32) IS GRANTED.  The Court declines to exercise supplemental jurisdiction

over the state common law claims which are dismissed without prejudice.  A separate Order

follows.


    6/30/20                                                          /S/
Date                                        Paula Xinis
                                            United States District Judge

---

[9] Tibbs must adhere to the Maryland Health Care Malpractice Claims Act, Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01, *et seq.,* which requires a plaintiff to file medical negligence claims with the Health Care Alternative Dispute Resolution Office (HCADRO) prior to filing suit.  *See id*. at § 3-2A-02; see also *Roberts v. Suburban Hospital Assoc., Inc.,* 73 Md. App. 1, 3 (1987).  Tibbs does not appear to have submitted his claims to HCADRO, which may bar any future claims in state court.